LEIGH M. CLARK, Retired Circuit Judge.
This is a consolidated appeal of two cases (CC-84-128 and CC-84-129), in each of which cases this appellant was convicted under an indictment charging that he “did, unlawfully; wilfully and feloniously sell, furnish or give away MARIJUANA.” In the first of the two cases, a jury found the defendant guilty; in the second case, the judgment of conviction was based upon a plea of guilty. The only issue presented on appeal is whether the evidence was sufficient “to furnish a jury question as to Appellant’s guilt.” The parties are in apparent agreement that by reason of the similarity of the actual facts in both cases a correct determination of the issue presented in the case tried by jury should be the same as the case in which a plea of guilty was entered. The court sentenced the defendant to imprisonment for fifteen years in each case, with the sentences to run concurrently, which by reason of defendant’s previous felony convictions constituted the minimum sentence prescribed by statute.
According to the undisputed testimony in the case tried before a jury, the defendant participated in a transaction involving a sale of marijuana to Corporal James Ham-ner of the Montgomery Police Department, who at the time was acting in an undercover capacity. With Corporal Hamner at the time was Ms. Pat Morgan, a police informer. Each of them testified on the trial, Corporal Hamner on call of the State and Ms. Morgan on call of the defendant. We quote from the testimony of Corporal Ham-ner:
“A. Yes, sir. At approximately 6:00, myself and Pat Morgan went to pick up Billy Payton over on Madison Avenue around the McDonald’s area. We pulled up; he got in the back seat of the car, and he told us that he had some good marijuana he could pick up and told us which way to go, so he gave us directions. We went across town to Goode Street. And it’s a house that is approximately second or third house on the left. We pulled in the driveway and got out and met another subject there. His name was George Furr. Billy talked to him for just a minute, and he said he would be right back. He went across the street. There are some projects across the street. And he came back with a black male approximately five minutes later and said they had to run down the street to get some and then they’d be back shortly. So Billy asked me for the money and I gave him the money and went down to — and then he went up to the car. I was on the front porch. He walked up to the car, and then the subjects left. They came back about thirty to forty-five minutes later. We went back in the house and they handed Billy a plastic bag containing a green substance which appeared to be marijuana. At that point, he handed it — he looked at it and said it smelled good — I think that’s what he said — and then he handed it to me.

“Q. When you say you handed Payton some money, do you remember the denomination of that money?
“A. I can check and see. (Referring to file.) I handed him one twenty-dollar bill and one five-dollar bill, for a total of twenty-five dollars.
“Q. Okay. Did you ever have any contact with the other individuals there at Goode Street? Did you talk with the people that left then came back?
“A. We carried on, you know, just a conversation when we first met them. “Q. But is it your testimony, Investigator Hamner, that it was Billy Payton that you gave the money to and Billy Payton brought this marijuana back to you? “A. Yes, sir, that’s correct.
“Q. Did you have any further conversation that day with Billy regarding drugs? “A. At that point, we left and went back ;o the McDonald’s on Madison Avenue, in that area and dropped him back off and he told me if I ever needed—

“Q. Go ahead, Investigator Hamner.
*182 “A. He said that if I ever needed any more, he’d get me some anytime I wanted it; just to let him know. Or he told me to let Pat know.
“Q. What did you do at that time?
“A. At that time, I went back to Pat
Morgan’s residence and got back in my vehicle and went back to the office.”
On cross-examination of Officer Hamner, he testified in part as follows:
“Q. On this particular occasion, you say that Billy Payton was known to Pat Morgan. How is it that you acquired his name from her? What specifically were you looking for? What did you ask for?
“A. Any drug dealer’s names that she knew of.
“Q. Any drug dealers or names she knew of?
“A. Yes.
“Q. And she told you, among others, I assume, Billy Payton?
“A. Yes, sir.
“Q. All right. Who called Billy Payton up to arrange this meeting between the three of you?
“A. She arranged it.”
On redirect examination of Officer Ham-ner, he testified in part as follows:
“Q. Investigator Hamner, let’s go back to Pat Morgan for just a minute. I believe you testified that you had dropped a charge of sale of cocaine — not you, but the Police Department in cooperation with the District Attorney’s office — had dropped a sale of cocaine against Pat Morgan in exchange for her providing you names of other drug dealers?
“A. That’s correct.

“Q. Going back to that house on Goode Street, now. You handed the money to Billy Payton; is that your testimony?
“A. That’s correct.
“Q. And you got the marijuana back from Billy Payton; is that the testimony?
“A. That’s correct.
“Q. Did you deal with anybody else?
“A. Other than talking to them, no, sir.”
The only witness who testified on call of the defendant was Patricia Morgan. She was called as an adverse witness by defendant. She testified in part as follows:
“Q. All right. How is it that you came to get together with Billy Payton? Did you call him up?
“A. I can’t remember. I may have called him and asked him if he knew where to buy some pot, and he said yes.
“Q. All right. And you and Officer Hamner were looking to buy the pot; is that correct?
“A. Well, he was looking to buy it; not me.
“Q. All right. Why is it that you were working with Officer Hamner?
“A. Because I had arrest records myself and I was trying to do away with those.
“Q. You were arrested for cocaine; is that correct?
“A. That’s right.

“Q. Has he ever asked you about getting Billy or keeping Billy out of trouble?
“A. I don’t know that he talked about him a whole lot. Billy seemed to keep getting himself involved. We were not necessarily looking to get any buys from him, is that what your question is?
“Q. You called him though, didn’t you?
“A. Yes.
“Q. As you can recall, you called him?
“A. Yes.
“Q. When you went over to the house— where was this house located?
“A. On the other side of town. It was off of Goode Street. I don’t know the area of the town; that’s not my kind of place.
“Q. Can you tell us what happened when you went over there?
“A. We met a great big guy that looked like a biker, and he was the one that was going to go see a friend of his, a black guy, and together they got in the car and they went to some other person’s house to pick it up, and brought it back to the biker guy’s house named George.
*183 “Q. Brought it back to the biker guy’s house. Is the house on Goode Street?
“A. That’s right.
“Q. Did you ever see any money change hands?
“A. James gave Billy the money. Billy paid the money. We never got involved with the George guy; we didn’t know him.
“Q. All right. Billy took y’all over there is that correct?
“A. Well, I drove; he rode in the car.
“Q. All right, he went with y’all?
“A. Yes.
“Q. Did he vouch for your credibility?
“A. Yes, I guess.
“Q. Well, I mean, when y’all went over there, didn’t he say I know these people, or something?
“A. Oh, yes, I think we were all supposed to be real good friends.
“Q. All right, so he vouched for your credibility?
“A. Yes.
“Q. Did you see Billy give the money to these other two individuals?
“A. I don’t recall. I know the money was given to Billy. That’s the only way the pot was going to come back, was to pay for it ahead of time.
“Q. Did you ever see Billy walk out to the car?
“A. I don’t recall if the money exchanged hands on the porch or at the car; I don’t know.
“Q. But the money—
“A. It has been so long ago, I don’t remember that kind of detail.
“Q. Well, your best recollection. Did the money exchange hands?
“A. Oh, yes, there was money that exchanged hands.
“Q. From Billy to the other people?
“A. Yes.
“Q. All right. And these other people, George Furr and — was the other person a black person?
“A. Yes.
“Q. Did they bring the drugs back?
“A. Yes.
Q. All right. What happened when they brought it back?
“A. Well, we all had been sitting on the porch, and we all went back inside the house to receive the pot.
“Q. All right. And did you go back inside the house to receive the pot?
“A. We all went inside, except for the guy’s father who stayed out on the porch.
“Q. Tell us who had the pot when you went inside?
“A. I believe that the other men went to the table, and I sat down on the couch. I think Billy was just standing around the living room. And I don’t remember if the black guy got it out, and I don’t know that George was involved any more in it than that, or what, but they gave it back to Billy. I felt like they trusted him more, or something, but they gave it back to him.
“Q. And then what did he do?
“A. Then he gave it to James.
“Q. All right. And did you all leave after that?
“A. Yes. They had taken up about an hour or so of our time, and we were late for something else to do, so we took off.
“Q. Did you all go make any other buys on that night?
“A. Not that I recall.
“Q. Did you make any other buys on that date?
“A. I don’t recall.
“Q. All right. Do you know whether or not Officer Hamner had any other drugs on him on this particular occasion?
“A. He never brought them with him, if that’s what you mean, no.
“Q. You didn’t see any other drugs?
“A. No.”
During the cross-examination of Patricia Morgan, she testified:
“Q. Ms. Morgan, this great big guy over on Goode Street, the biker, you didn’t know him did you?
“A. No.
*184 “Q. And you didn’t know the black guy, did you?
“A. No.
“Q. To the best of your knowledge, did Investigator Hamner know the big guy? “A. I think that they knew of him, but we didn’t know of him until we got there, and then he knew something about him, whether he had been in trouble before, or whether they knew he dealt drugs or what; I don’t know. But he was relatively a little bit familiar, I think. Being there or having known someone else who had been there, or something.
“Q. This buy on Goode Street, it wouldn’t have happened if Billy Payton hadn’t taken you over there, would it? “A. No, I didn’t know the people.
“Q. Had you been involved prior to this in the past in any drug deals with Billy Payton?
“A. Not frequent.

“Q. Prior to May 25, 1983, had Billy talked with you about drug buys?

“Q. And you remember the question, Ms. Morgan?
“A. Yes. The answer is yes, and that goes from both sides. He would get me something if I knew someone, and I would get him something if he knew someone. That would be prior to my arrest, also.

“Q. It’s a fact, is it not, that he was also making money from drug deals at this point in time?
“A. I don’t know if he had made any money, or not.”
Both of the parties on appeal, by their respective counsel, rely largely, for their respective opposing contentions, upon the lengthy opinion in Hill v. State, Ala.Cr. App., 348 So.2d 848, cert. denied, Ala., 348 So.2d 857 (1977), in which it was held that the evidence was insufficient to support a jury verdict and resultant judgment thereon that Hill was guilty of selling marijuana. In reaching such conclusion in Hill, this Court considered a large number of cases in other jurisdictions, some of them tending to support and others tending to refute the conclusion reached in Hill. Neither party in the instant case suggests that this Court now overrule Hill v. State; appellant contends that consistency with Hill v. State requires a reversal of the judgment of the trial court in the instant case; appellee’s contention is to the contrary. We agree with appellee.
There are numerous similarities between the facts in the instant case and the facts in Hill v. State and the cases relied upon therein for holding that the evidence was insufficient in Hill to present a jury issue as to his guilt of selling marijuana. However, there are distinguishing differences between the case now being decided and those cases, as shown by the testimony in this case as quoted above and the evidence in the other cases as set forth in the opinion in Hill v. State. In our opinion, the case cited in Hill v. State in which the facts are more like those in the case sub judice is Baker v. State, 52 Ala.App. 150, 290 So.2d 214 (1973), writ denied, 292 Ala. 708, 290 So.2d 217 (1974), as to which case it is stated in Hill v. State at 348 So.2d 855:
“We doubt not that a criminal linkage between a seller and one acting at the behest of a buyer of a controlled substance can be shown by circumstantial evidence. We so held in Baker v. State, 52 Ala.App. 150, 290 So.2d 214, writ denied, 292 Ala. 708, 290 So.2d 217. In Baker, the evidence for the State was that while the undercover agent and his informer discussed the subject of marijuana at defendant’s home, defendant went to ‘his Cadillac parked outside ... opened the front door of the parked vehicle ... appeared to be getting something off the seat of the automobile’ and thereafter had ‘what appeared to be Manila envelopes in his hand, of the same size of the envelopes containing the marijuana sold by another to the agent. Defendant, before returning to his home where the agent and informer were, went down the street and in a few minutes returned to his home without the envelopes and *185 told the agent and the informer ... that a guy down the street had the stuff and we could go down there and get it.’ Defendant, the agent and the informer then went in the agent’s automobile in the direction defendant had walked with the Manila envelopes and purchased marijuana from a man by the name of Miller who came to the automobile and joined the other three therein. After buying the marijuana from Miller, the agent asked him if the agent could come back and get a larger quantity. Instead of Miller replying, the defendant said, according to the agent, ‘Come back anytime and get as much as you want.’ In his testimony defendant denied that he had possession of any Manila envelopes. The court concluded that irrespective of the question whether defendant had Manila envelopes in his possession, the trial court was not in error in overruling defendant’s motion for a new trial, nor in refusing defendant’s request for a general affirmative charge in his favor. The circumstances in Baker are to be contrasted rather than compared, with those in instant case [Hill v. State ].”
We conclude that the sole issue presented by appellant is not well taken and the judgments of the trial court should be affirmed.
The foregoing opinion was prepared by Retired Circuit Judge LEIGH M. CLARK, serving as a judge of this Court under the provisions of § 6.10 of the Judicial Article (Constitutional Amendment No. 328); his opinion is hereby adopted as that of the Court.
AFFIRMED.
All Judges concur.